TERRI KEYSER-COOPER
Law Office of Terri Keyser-Cooper
Nevada Bar No. 3984
3590 Barrymore Dr.
Reno, NV 89512
(775) 337-0323
keysercooper@lawyer.com

LUKE A. BUSBY
Luke Andrew Busby, Ltd.
Nevada Bar No. 10319
216 Liberty St.
Reno, NV 89501
(775) 453-0112
luke@lukeandrewbusbyltd.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

|  |  |
|---|---|
| JOHN MORSE III and DEBBIE MORSE; administrators of the ESTATE OF JOHN WILLIAM MORSE, IV; and STEPHANIE MORSE, |  |
| Plaintiffs, | Case. No. 3:17-cv-00209-LRH-VPC |
| vs. | **FIRST AMENDED COMPLAINT** |
| GRANT LEE, CARLA MURAKAMI, and the STATE OF NEVADA, DEPARTMENT OF CORRECTIONS, and DOES 1-10 | **JURY DEMAND** |
| Defendants. | |

## JURISDICTION AND VENUE

1.     This action arises under Title 42 of the United States Code, 28 U.S.C. Sections 1983

and 1988. Jurisdiction is conferred upon this Court by Title 28 of the United States Code, sections

1331, 1343, 42 U.S.C. Section 12188(a), Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act.

2.     Venue in this action is appropriate in the Northern District of Nevada pursuant to 28 U.S.C. Section 1391(b) because the unlawful acts and practices alleged herein occurred in Northern Nevada, which is within this judicial district.

3.     This Court has jurisdiction to grant the declaratory relief requested pursuant to 28 U.S.C. Section 2201 and Federal Rules of Civil Procedure, Rule 57.

**PARTIES**

4.     Plaintiff JOHN MORSE, III is the duly appointed, qualified, and acting special co-administrator of the ESTATE OF JOHN WILLIAM MORSE, IV, deceased, and herein the father of the Decedent Morse. JOHN MORSE, III ("Mr. Morse") is a citizen of the United States residing in Washoe County, Nevada. Mr. Morse is a co-beneficiary of the estate of his son, Decedent Morse.

5.     Plaintiff DEBBIE MORSE is the duly appointed, qualified, and acting special co-administrator of the ESTATE OF JOHN WILLIAM MORSE, IV, deceased, and herein the mother of the Decedent Morse. DEBBIE MORSE ("Mrs. Morse") is a citizen of the United States residing in Washoe County, Nevada. Mrs. Morse is a co-beneficiary of the estate of her son, Decedent Morse.

6.     Plaintiff STEPHANIE MORSE ("Stephanie Morse") is the wife of the Decedent Morse.  Stephanie Morse is a citizen of the United States residing in Burlington County, New Jersey. Stephanie Morse is a co-beneficiary of the estate of the Decedent Morse.

7.     Defendant GRANT LEE, M.D. ("Lee") was at all relevant times employed as a psychiatrist at Northern Nevada Correctional Center ("NNCC"), a prison located in Carson City, Nevada and part of the Nevada Department of Corrections ("NDOC"). Plaintiffs allege Lee was

deliberately indifferent to Decedent Morse's medical and mental health needs and safety, failed to provide psychiatric care to him or take other measures to prevent him from attempting suicide, violated his civil rights, wrongfully caused his death, and/or encouraged, directed, enabled and/or ordered other Defendants to engage in such conduct. Plaintiffs further allege that Lee violated Plaintiffs' Fourteenth Amendment rights to familial association and companionship, which is predicated on Lee's deliberate indifference in causing the death of Decedent Morse. Lee is sued under color of law and in his individual capacity.

8.    Defendant CARLA MURAKAMI ("Murakami") was at all relevant times employed under color of law as a psychologist II at NNCC. Plaintiffs allege Murakami was deliberately indifferent to Decedent Morse's medical and mental health needs and safety, failed to provide psychiatric care to him or take other measures to prevent him from attempting suicide, violated his civil rights, wrongfully caused his death, and/or encouraged, directed, enabled and/or ordered other defendants to engage in such conduct. Plaintiffs further allege that Murakami violated Plaintiffs' Fourteenth Amendment rights to familial association and companionship, which is predicated on her deliberate indifference in causing the death of Decedent Morse. Murakami is sued under color of law and in her individual capacity.

9.    Defendant STATE OF NEVADA, DEPARTMENT OF CORRECTIONS ("NDOC") is a public entity incorporated under the laws of the State of Nevada per Nevada Revised Statutes ("NRS") 209.011 *et seq*.

10.    Plaintiffs allege Title II of the ADA applies to NDOC, a public entity. Title II of the ADA states: No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. Section 12132.

11.    State prisons fall squarely within the statutory definition of "public entity," which

includes "any department, agency, special purpose district, or other instrumentality of a State of States or local government." Section 12131(1)(B).

12. Plaintiffs alleges Section 504 of the Rehabilitation Act applies to NDOC and imposes upon NDOC the general rule that no otherwise qualified individual with a disability shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

13. Plaintiffs allege that NDOC receives federal funding.

14. Plaintiffs allege that NDOC and/or its agents, employees, and servants performed, participated in, aided and/or abetted in some manner the acts averred herein, proximately caused the damages averred below, and is liable to Plaintiffs for the damages sought herein. Plaintiffs further allege that NDOC ratified, approved, delegated, and authorized all actions of its agents, employees, and servants to carry out the denial of programs and activities to Decedent Morse.

15. Plaintiffs are ignorant of the true names and capacities of Defendants DOES 1 through 10, inclusive, and, therefore sue these Defendants by such fictitious names. Plaintiffs are informed and believe and thereon allege that each DOE Defendant so named was employed by the NDOC at the time of the conduct alleged herein. Plaintiffs allege Defendants DOES 1 through 10, and each of them, were deliberately indifferent to Decedent Morse's medical and mental health needs and safety, failed to provide psychiatric care to him or take other measures to prevent him from attempting suicide, violated his civil rights, wrongfully caused his death, and/or encouraged, directed, enabled and/or ordered other defendants to engage in such conduct. Plaintiffs further allege that the DOE Defendants violated Plaintiffs' Fourteenth Amendment rights to familial association and companionship, which is predicated on their deliberate indifference in causing the death of the Decedent Morse. Plaintiffs will amend their complaint to state the names and capacities of DOES 1 through 10, inclusive, when they have been ascertained.

16.     Each of the Defendants caused and is responsible for the unlawful conduct and resulting harm by, inter alia, personally participating in the conduct, or acting jointly and in concert with others who did so, by authorizing acquiescing, condoning, acting, omitting or failing to take action to prevent the unlawful conduct, by promulgating or failing to promulgate policies and procedures pursuant to which the unlawful conduct occurred, by failing and refusing to initiate and maintain proper and adequate policies, procedures and protocols, and by ratifying and condoning the unlawful conduct performed by agents and officers, correctional staff, caseworkers, medical providers and employees of NDOC—all of which resulted in the death of Decedent Morse.

17.     Whenever and wherever reference is made in this Complaint to any act by Defendants, each Defendant was the agent of the others, was acting within the course and scope of this agency, and all acts alleged to have been committed by any one of them shall also be deemed to mean the acts and failures to act of each Defendant and DOE Defendants individually, jointly or severally.

## FACTUAL ALLEGATIONS

18.     Decedent Morse, age 27, a young man of enormous potential, a war hero, led a short and tragic life. His participation in the war in Iraq harmed him in a most disastrous way. He entered the war a healthy, happy teenager and returned a devastated shell—emotionally ravaged and physically scarred. Decedent Morse saw much death and destruction in Iraq, even beheadings, he was unable to forget it and unable to move forward. He was unable to work and unable to to function—he was preoccupied with religious delusion, space aliens, suicide, and the unrelenting death and devastation he witnessed. His diagnosis of Post Traumatic Stress Disorder ("PTSD") and Paranoid Schizophrenia from the Veterans Administration ("VA") resulted in a finding of 100 percent disability.

19.     Decedent Morse was entered the United States Army at the age of 18. Decedent Morse was deployed to Iraq at age 18 after completing ten weeks of basic combat training and six weeks of advanced individual training in the classroom and in the field under simulated combat conditions. Decedent Morse was in Iraq from 2005 to 2009 serving as a 13F10 Fire Support Specialist. A Fire Support Specialist is on the front line of combat, responsible for assisting in the preparation of fire support plans, coordinates and targets. A Fire Support Specialist operates laser range finders and target devices and determines target locations using computers or manual calculations. A Fire Support Specialist operates cannons and rockets and operates gun, missile, artillery, and rocket systems on direct targets—killing enemies and sometimes unintended civilians. It is a most dangerous job directly on the frontline of combat, one of the military's most hazardous assignments.[1]

20.     From the age of 18 and continuing until his military separation, Decedent Morse lost dozens of friends and unit members to death and disfigurement. Decedent Morse endured rocket and grenade blasts on a daily basis, living in daily fear of death.

21.     Decedent Morse earned the Army Commendation Medal, Army Achievement Medal, Army Good Conduct Medal, National Defense Service Medal, Global War on Terrorism Service Medal, Iraq Campaign Medal w/ Campaign Star, Army Service Ribbon/ Overseas Service Ribbon, and Combat Action Badge.

22.     Decedent Morse earned an Honorable Discharge following misconduct for drug dependency developed during his military service.

23.     Decedent Morse returned to his family in Reno, Nevada on or about 2009 a radically

---

[1] Decedent Morse discussed with Plaintiffs, and each of them, having to kill enemy combatants daily. He discussed visiting with Iraqi families only to find them within days all killed, many beheaded.

6

changed person.[2] Decedent Morse returned withdrawn, unsocial, irritable, reserved and remote. He talked seldom about his military experiences, preferring solitude, but when he did talk he let Defendants know the horrific nature of his experiences.

24.     Despite a panoply of prescribed medication from the VA to keep him safe and sane, Decedent Morse returned to Nevada dependent on illegal street drugs and alcohol.

25.     From 2009 until 2014 (the time of his arrest on felony charges), Decedent Morse was in and out of the psychiatric ward of the Reno VA Hospital, receiving both in-patient and out-patient psychiatric services. Decedent Morse was prescribed Valproic Acid, a medication used to treat seizure disorders, mental/mood conditions (such as manic phase of bipolar disorders); Seroquel, an antipsychotic medicine used to treat schizophrenia and bipolar disorder; and, Depakote, an anti-seizure medication used to treat manic episodes related to bipolar disorder and manic depression.

26.     On or about 2010, Decedent Morse was diagnosed by the Veteran's Administration as having service related Post Traumatic Stress Disorder ("PTSD")[3]  and Paranoid Schizophrenia[4] and given a 100 percent disability pension and monthly stipend of approximately $2,900.00.

27.     Morse's long and well documented history of suffering from PTSD and Paranoid

---

[2] While still in the military, in 2008, Decedent Morse married Stephanie Morse in Kansas.

[3] PTSD is now believed to be more physical than psychological with new studies supporting what a small group of military researchers has suspected for decades, that modern warfare destroys the brain and the destruction is measurable, creating visible wormlike squiggles and folds upon the brain. PTSD, according to the DSM-5 is now classified as a "trauma and stressor-related disorder." PTSD is characterized by persistent and distorted blame of self or others and a persistent negative emotional state. Symptoms and emotional reactions involve intense fear, hopelessness, inability to experience positive emotions, emotional numbness, loss of memory, self-destructive behavior, irritability, overwhelming guilt or shame, and suicidal ideation.

[4] Paranoid Schizophrenia is a subtype of schizophrenia in which the patient has delusions (false beliefs) that a person or groups of individuals are plotting against them. Paranoid schizophrenics typically hear things that are not real, suffer from high anxiety, mild anger to fury and rage, detachment, mood swings, obsession with death, dying or violence, increased consumption of illegal drugs and alcohol, and suicidal ideation.

Schizophrenia qualifies him as disabled under the ADA. Morse's mental illness substantially limited the major life activity of working.

28.     Despite having sufficient funds to modest live, Decedent Morse could not cope. He could not pay his bills, take care of his meals, or function in even the most mundane manner. He gave his money away, lived under a bridge, and stole food from grocery and convenience stores. He had outbursts of emotionality, disturbing the peace, and destroying property. His life was a shamble of self-destructive conduct and sporadic interaction with law enforcement over minor misdemeanor matters.[5] He was unable and/or refused to keep on his necessary and prescribed medication regime.[6]

29.     Decedent Morse became obsessed with religion and with alien life. He talked about God, about the need to accept Jesus Christ as a personal savior, about the importance of blood covenants, and about aliens alternatively coming to save him or destroy him.

30.     On May 30, 2014, officers responded to a report of a suicidal male who was reported to have stabbed himself in the head following a bizarre situation with his then girlfriend. Earlier that day, Decedent Morse demanded his girlfriend accept Christ as her personal savior and demanding that she make a blood covenant with him to accept Christ as her savior.[7] When the girlfriend/victim refused, he bound her with straps, attacked her, threatened to kill her, and choked her—all the while insisting she accept Christ as her personal savior. During the course of the attack, Decedent Morse stabbed himself in the face and head.

31.     Decedent Morse's Presentence Investigation Report ("PSI") references when officers came to the door on May 30, 2014, they saw a male "armed with a knife and covered in blood"

---

[5] For example, Decedent Morse was ticketed for driving without a seat belt and failure to have insurance. He refused to take care of the ticket and it became a warrant. He was unable to take care of the warrant which escalated into other problems and issues.

[6] Decedent Morse was unable to hold a job after his military separation. He worked as a casino security guard and briefly at Burger King—with involuntary termination from each.

[7] A blood covenant is a kind of promise, a contract, a binding agreement between two parties referred to in the fifteenth chapter of Genesis.

8

stating he "wanted to die." Decedent Morse's shorts were ripped in the front crotch area and were also covered in blood.  Prior to his arrest, a VA case worker was asked by Decedent Morse to remove a book that was the "work of the Devil," the book was actually a book of games to play with children. The PSI contains references to Decedent Morse's diagnosis of PTSD and Paranoid Schizophrenia and anti-psychotic medication.

32.    On October 2, 2014, Decedent Morse pled guilty to Battery by Strangulation for a minimum term of 24 months to a maximum term of 60 months and Kidnapping in the Second Degree for a minimum term of 24 months to a maximum term of 156 months, to be served consecutively.

33.    On January 23, 2015, Decedent Morse was classified and evaluated by Defendant Murakami who read Decedent Morse's PSI report, noting in Decedent Morse's "Mental Health Assessment Initial Classification and/or Psychiatric Referral" that Decedent Morse:

- Demonstrated suicidal behavior by attempting to hang himself two months earlier;

- Was on disability for PTSD;

- Had used meth and alcohol;

- Had attempted to kill himself;

- Had been a patient in a mental hospital or a psychiatric unit;

- Had been seen by a psychiatrist or other mental health professional;

- Had been an alcoholic or had a drinking problem;

- Had used illegal or street drugs, largely Methamphetamine;

- Had been prescribed Seroquel and Valproic Acids by a doctor for mental or emotional problems;[8]

- Had exposure to Life/Limb threatening events in combat;

---

[8] Murakami also saw in Decedent Morse's PSI report his use of Depakote.

1

- Re-experienced those events from combat;

2

- Exhibited hypervigilance and avoidance behaviors;

3

4

34.     Murakami     noted     she     suspected     "thought"     disorders     and

5

"hallucinations" and reported Decedent Morse's self-injury from cutting since age of 20 (begun

6

during his military service).

7

35.     Murakami also noted Decedent Morse had religious preoccupation and delusions

8

based on his history. Murakami's diagnostic impression was PTSD and Borderline Personality

9

Disorder.[9]

10

36.     On January 23, 2015, Murakami referred Decedent Morse to "Psychiatry."

11

37.     Yet on January 23, 2015, Murakami also classified Decedent Morse on a form

12

entitled "Mental Health Classification" under the heading "Classification Categories" as having

13

14

only "mild impairment." Decedent Morse's file as provided by NDOC contains no further reference

15

to Decedent Morse seeing or receiving mental health treatment or services by Murakami or any

16

other psychologist at NNCC after January 23, 2015.

17

38.     On January 27, 2015, in response to an NDOC "Confidential Questionnaire"

18

Decedent Morse noted history of intravenous drug use and a suicide attempt three months earlier.

19

39.     On January 28, 2015, Defendant Lee "reclassified" Decedent Morse as having "no

20

current impairment." Lee changed Murakami's classification of "mild impairment" to "no current

21

22

impairment in the space of five days. Lee, under the heading "Mental Health Restrictions" noted,

23

24

_____

25

[9] Borderline Personality Disorder ("BPD") is a serious mental illness marked by unstable moods, behavior, and relationships People who have BPD suffer from problems with regulating emotions and thoughts, impulsive and reckless behavior—often exhibiting extreme reactions including panic, depression, and rage. It is characterized by a pattern of intense and stormy relationships with family, friends, and loved ones, often veering from extreme closeness and love to extreme dislike or anger. It is further characterized by distorted and unstable self-image or sense of self and recurring suicidal behaviors or threats of self-harming behavior such as cutting. As many as 80 percent of people with BPD have suicidal behaviors.

26

27

28

"no restrictions." Lee noted in his very brief "Progress Notes" dated January 28, 2015, that Decedent Morse stated he is "feeling better" the longer he stays away from drugs.[10] Decedent Morse's file as provided by NDOC contains no further reference to Decedent Morse seeing or receiving mental health treatment or services from Lee or any other psychologist at NNCC after January 28, 2015.

40.     Decedent Morse was placed in NNCC general population. Decedent Morse was not provided with any special observation or treatment for mental health issues or suicidal ideation. He was not observed, interviewed, monitored, or protected in any way. He was treated as every other NNCC general population inmate is treated, without any precautions despite his diagnosis and known preoccupation with suicide. It was evident to anyone who spent even a single moment with Decedent Morse he was withdrawn, hostile, antisocial, and given to constant talking, singing, and laughing to himself. He would stand in bed and sing the Pledge of Allegiance at 2:00 a.m. when others were trying to sleep. He would destroy his property and the property of others. He smashed a television and sweep items off a counter top. His cell mates report he never stopped talking to himself about religion and aliens coming to take him away and destroy him. Had Defendants spent even a moment working with, observing and/or monitoring Decedent Morse, all of these facts would be instantly obvious to them.

41.     Decedent Morse's history at NNCC was unremarkable save for one disciplinary infraction. On December 8, 2015, he was written up for "failure to attend work" after saying he "did not want to work." Decedent Morse received loss of canteen privileges for ten days.

42.     On February 13, 2016 at 2:40 a.m. Decedent Morse was found by NNCC staff hanging dead by a shower rod.

43.     On information and belief, Decedent Morse refused to program at NNCC, refusing to

---

[10] Much of what Lee states on the "Progress Notes" is not decipherable due to poor handwriting.

work, to attend classes, or to socialize. Further, on information and belief, Defendants, and each of them, knew and had notice Decedent Morse was at all times extremely mentally ill during his incarceration. Decedent Morse was: withdrawn, hostile, antisocial, and occasionally violent, smashing unit microwaves and televisions. In addition, Defendants, and each of them, knew and had notice (because it was common knowledge) Decedent Morse would sit all day and all night watching television, talking to himself about religion and aliens—frequently talking about how God would punish him and others and how aliens were coming to take him away.

44.     On information and belief, Decedent Morse was moved to various units and various dorms during his stay at NNCC because of an inability to get along with other inmates.

45.     On information and belief, Decedent Morse received no mental health care, services or treatment during his stay at NNCC despite notice and knowledge of: Decedent Morse's PSI report which references: 1) suicidal conduct and statements of wanting to die; 2) self mutilation and facial stabbing; 3) irrational statements about the Devil, Christ, and blood covenants.

46.     On information and belief, Decedent Morse received no mental health care, services or treatment during his stay at NNCC despite notice and knowledge by Murakami that Decedent Morse: 1) had demonstrated suicidal behavior by attempting to hang himself two months earlier; 2) was on disability for PTSD; 3) had used meth and alcohol; had attempted to kill himself;  4) had been a patient in a mental hospital or a psychiatric unit; 5) had been seen by a psychiatrist or other mental health professional; 6) had been an alcoholic or had a drinking problem; 7) had used illegal or street drugs, largely Methamphetamine; 8) had been prescribed Seroquel and Valproic Acids by a doctor for mental or emotional problems;[11] 9) had been expose to life/limb threatening events in combat; 10) had re-experienced those events from combat; 11) had exhibited hypervigilance and avoidance behaviors; 12) had a history of "cutting" from the age of 20 while in the military; 13) was

---

[11] Murakami also saw in Decedent Morse's PSI report his use of Depakote.

suspected of thought disorders and hallucinations; 14) had a history of intravenous drug use; 15) was suspected of religious preoccupation and delusions; and, 16) was referred to "Psychiatry." .

47.     On information and belief Defendant Lee read Defendant Murakami's evaluations and classifications of Decedent Morse and was at all times aware, having actual and/or constructive knowledge of all information possessed by Murakami's reports.

48.     On information and belief, staff at the prison who interacted with Decedent Morse knew he was extremely mentally ill and at serious risk of suicide and failed to take the most basic steps to protect him. Instead, Defendants had him placed in an ordinary cell, leaving him isolated and alone with no monitoring. Despite knowledge of a past history of suicide attempts and suicidal ideation, Defendants left Decedent Morse with the means to kill himself.

49.     Decedent Morse indicated on multiple occasions to Defendants through his statements made in his PSI report and during his initial assessment that he had recent suicide attempts and/or suicidal ideation. Decedent Morse was known to have taken anti-psychotic medication prescribed by doctors that had a known side effect of suicidal ideation. Decedent Morse was known to be on one-hundred percent disability for military service related PTSD.

50.     Both Defendants Murakami and Lee are trained medical professionals. Both have had extensive medical training. Both Murakami and Lee were aware of Decedent Morse's PSI report and Murakami's interview and assessment finding multiple serious indicators of a serious need for mental health care and a substantial risk of suicide (See Paragraph 38). Both Murakami and Lee were aware from their education, experience, and training, that previous suicide attempts are indicative of a serious risk of future harm. Both Murakami and Lee were aware of the deluge of medical studies of veterans returning from Iraq and Afghanistan with PTSD and the devastating and serious effects of combat related PTSD. Both Murakami and Lee were aware of the serious risk of

harm to Decedent Morse and both ignored it—deciding he needed no restrictions and no mental health care.

51.    A.R. 643.02 (1) "Standards for Mental Health Care" states: "The goal of Mental Health services in the Department is to provide for the detection, diagnosis, treatment, and referral of inmates with mental health problems, and to provide a supportive environment during all stages of each inmate's period of incarceration.

52.    A.R. 643.02 (2) "Standards for Mental Health Care" states: "All inmates with mental illness, intellectual disabilities, developmental disabilities, a history of mental health treatment or intervention, or with current symptoms, should be identified, evaluated, and have information entered into the medical record and NOTIS."

53.    A.R. 643.02 (8) "Standards for Mental Health Care" states: "All inmates with mental illness, intellectual disabilities, developmental disabilities, a history of mental health treatment or intervention, or with current symptoms, should be identified, evaluated, and have information entered into the medical record and NOTIS."

54.    A.R. 653.01 (1) Admission and Discharge of Mental Health Inmates at the Mental Health Unit states: "An emergency transfer to the MHU may be approved by a practitioner if the inmate appears to represent a danger to himself/herself or others."

55.    A.R. 653.01 (7) Admission and Discharge of Mental Health Inmates at the Mental Health Unit states: "The Interdisciplinary Classification Committee (ICC) should base a decision on future mental health care for an inmate on: 1) Whether an inmate's mental health care based on" Whether the inmate poses an immediate risk to self or others; 2) Whether the inmate suffers from a mental illness or other significant psychiatric disorder such that immediate treatment is necessary to prevent further deterioration of the inmate's condition; and, 3) on whether the inmate is in need of

an evaluation conducted in the mental health unit to clarify the presence/absence of a mental disorder, and a need for treatment of any disorder that is identified. An emergency transfer to the MHU may be approved by a practitioner if the inmate appears to represent a danger to himself/herself or others."

56.     Defendants ignored these administrative regulations and provided no service, and or benefits of the services of trained mental health professionals, to Decedent Morse despite the obvious need that they provide these services.

57.     Defendants failure to protect Decedent Morse despite his known suicide risk was the actual and proximate cause of his suicide. Had Decedent Morse been placed on suicide watch during any of the times he became visibly anxious, violent, destructive (with appropriate reference to his inmate screening, history, and evaluations), Decedent Morse would have received the care he desperately required and would not now be dead.

58.     Decedent Morse's death was the proximate result of Defendant's failure to reasonably consider his history and to reasonably supervise and care for him, especially having been on notice of his history of suicide attempts and/or ideation, his mental health condition, and his current state of extreme agitation personality deficiencies, and volatility including while in custody.

59.     Plaintiffs allege that Defendants allowed conditions at NNCC to deteriorate, causing an environment where standards for mental health care were deliberately ignored and protocols for inmate safety were disregarded.

60.     Defendants had, and have, a mandatory duty of care to properly and adequately hire, train, retain, supervise, and discipline its officer and medical employees so as to avoid unreasonable risk of harm to inmates. Defendants, each and all, failed to take necessary, proper, or adequate measures in order to prevent the violation of Decedent Morse's and Plaintiffs' rights, the suffering

and death of Decedent Morse, and injuries and damages to Plaintiffs. Defendants inclusive, breached their duty of care to Decedent Morse in that they failed to adequately train, supervise and discipline their staff and other medical personnel employees, in the exercise of professional standards of care of suicidal patients; and in the proper detention and supervision of inmates and suicidal inmates at NNCC. This lack of adequate supervisorial training demonstrates the existence of an informal custom or policy of promoting, tolerating, and/or ratifying with deliberate indifference ongoing failures in monitoring inmates, including Decedent Morse, by Defendants.

61.     Plaintiffs allege that Defendants failed to promulgate appropriate policies, guidelines and procedures and have failed to rectify improper practices and customs with regard to the mental health treatment and/or health and safety of NNCC inmates. The failures include, but are not limited to, a failure to meet legal, national/professional and medical standards relating to the medical and psychiatric care of inmates, a failure to ensure that mental health professions provide proper treatment to mentally ill inmates; a failure to ensure that medical health professionals engage in proper and required welfare checks of inmates, a failure to maintain adequate mental health staff at NNCC.

62.     Defendants had knowledge and consciously disregarded of the substantial risk of harm caused by inadequate suicide prevention and treatment mental health treatment and practice toward Decedent Morse at NNCC, but failed to take steps to prevent, or even diminish, the harmful effects of these unlawful policies and practices. Defendants were thus deliberately indifferent to the risk of harm to Decedent Morse created by their documented failure to provide constitutionally adequate suicide prevention and treatment for Decedent Morse.

63.     On information and belief, Defendants had knowledge that NNCC maintained a prison facility that was overpopulated and understaffed with mental health providers and that

frequently no mental health provider or physician was present. On information and belief, Defendants had knowledge that NNCC maintained inadequate mental health professional staffing which contributed to the conditions and a de facto policy of inadequate monitoring of Decedent Morse who had demonstrable mental illness, suicidal attempts, suicidal ideation, and a diagnosis of mental health problems plainly associated with suicidal ideation. These conditions, known at the time to all Defendants, itself amounted to deliberate indifference as to the Eighth Amendment right of its inmates, specifically Decedent Morse, to adequate suicide prevention.

64.     Despite clear knowledge of Defendants issues, history, and diagnosis of mental health problems typically associated with suicidal ideation, Defendants failed to provide adequate care, treatment, and observation of Decedent Morse and consciously disregarded their knowledge such as to reduce the risk of suicide. Defendants failed to properly monitor Decedent Morse, observe Decedent Morse, or place Decedent Morse in a unit where he could be observed on a more regular basis. By placing Decedent Morse in general population, Decedent Morse was at risk of suicide because of the intermittent and unpredictable observation of inmates in general population. Decedent Morse, in the throes of extreme mental illness, wanted to be left alone and Defendants were all to happy to oblige and leave him alone.

65.     Defendants' placement of Decedent Morse in general population was inadequate to ensure the safety of Decedent Morse and amounted to a deliberate indifference to the safety and life of Decedent Morse. Defendants had knowledge that by placing Decedent Morse in general population he would receive only most sporadic and intermittent observation by caseworkers and staff and no observation at all during the late evening/early morning hours when he was at liberty to go to shower stalls and bathrooms and use the shower rods as an anchor for to hang himself.

66.     Defendants' deliberate indifference to Decedent Morse's serious medical and mental

health needs and safety resulted in his long-term suffering and ultimately to his death.

67.     As a direct and proximate result of Defendants' deliberate indifference to Decedent Morse's high risk of suicide, his surviving parents and wife have lost the care, comfort, love, protection, advice, society, companionship, and physical assistance in addition to expectations of support, maintenance and other pecuniary benefits of their son and husband.

68.     Each individual Defendant acted recklessly or with callous indifference to Decedent Morse's life threatening physical, medical and/or psychiatric condition and to Plaintiff's constitutional rights. Plaintiffs, as Decedent Morse's beneficiaries, are therefore entitled to an award of punitive damages against said individual Defendants.

69.     Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights, and the rights of Decedent Morse, under the law. Plaintiffs are therefore entitled to recover all attorneys' fees incurred in relation to this action pursuant to Title 42 United States Code section 1988.

## FIRST CAUSE OF ACTION

**(Deliberate Indifference, Eighth and Fourteenth Amendments and 42 U.S.C. Section 1983)**

**(Against Murakami and Lee)**

70.     Plaintiffs hereby re-allege and incorporate by reference all preceding paragraphs of this Complaint.

71.     Defendants' policies, practices, acts, and omissions caused Plaintiffs to be subjected to deprivation of rights by Defendants, acting under color of law of the United States and State of Nevada which rights include, but are not limited to, privileges and immunities secured to Plaintiffs by the Constitution and laws of the United States.

72.     Defendants' deliberate indifference to Decedent Morse's serious medical/psychiatric

needs put Decedent Morse at substantial risk of injury, caused him avoidable pain, mental suffering, and deterioration of his health, and resulted in his death.

73.     Defendants' policies, practices, acts, and omissions evidence constitutes deliberate indifference to the serious medical needs of Decedent Morse and violates the Cruel and Unusual Punishments Clause of the Eighth Amendment, made applicable to the States through the Fourteenth Amendment to the United States Constitution.

74.     Defendants have acted with deliberate indifference to Decedent Morse's serious medical needs by implementing, sanctioning, approving, ratifying, or fail to remedy policies, practices, acts and omissions that deny, delay or intentionally interfere with medical/psychiatric treatment.

75.     By reason of the aforementioned acts, these Defendants, and each of them, have violated the constitutional rights and liberty interests of Decedent Morse, including those provided in the Eighth and Fourteenth Amendments to the U.S. Constitution and each Plaintiff, as well as those which are protected under the Fourteenth Amendment's prohibition against depriving a person of a right to familial relationships without due process of law.

76.     These Defendants knew of and consciously disregarded Decedent Morse's serious medical, physical and mental health condition and substantial risk of suicide and were deliberately indifferent to them, ignored them, failed to provide medical or mental health intervention and failed to care for him.

77.     Defendants knew of and consciously disregarded that Decedent Morse was suffering from a mental disability and was a high-risk candidate for suicide, which subjective knowledge may be imputed from the obviousness of the risk. Knowing this, Defendants were deliberately indifferent to his clear need for basic suicide prevention measures, ignored his obvious signs of extreme mental

illness, failed to provide mental health observation, monitoring and treatment, and failed to place him in a unit where he could have even minimal care and supervision to prevent the serious risk of harm of suicide.

78.     Defendants knew and consciously disregarded, that Decedent Morse had a serious but treatable mental health condition which required care, treatment and close supervision. Decedent Morse's background, as gleaned from his intake documents and PSI would have established that he had severe military service related PTSD from repeated exposure to grenade, mortar, and explosive blasts, death and dying. As a result of Defendants' deliberate indifference, Decedent Morse was deprived of the necessary and indicated medical intervention, care and treatment. Without proper treatment or follow-up care, his mental state deteriorated, causing him to continue to suffer pain and mental anguish in violation of his Eighth and Fourteenth Amendment rights and resulting in his wrongful death by suicide.

79.     As a direct and proximate result of the Defendants' deliberate indifference to Decedent Morse's high risk of suicide, the surviving parents and wife have lost the care, comfort, love, protection, advice, society, companionship, and physical assistance in addition to expectations of support, maintenance and other pecuniary benefits of their son and husband.

80.     As a legal cause of Defendants' deliberate indifference, acting under color of law, acts and/or inactions, Plaintiffs were deprived of their constitutional rights to a familial relationship with Decedent Morse. Defendants' deliberate indifference caused injuries that resulted in Decedent Morse's death, all in violation of rights, privileges, and immunities secured by the Eighth and Fourteenth Amendment to the United States Constitution.

///

///

**SECOND CAUSE OF ACTION**

**(Violation of Title II of the ADA)**

**(Against NDOC)**

81.     Plaintiffs reallege all preceding paragraphs and incorporates them by reference.

82.     At all times relevant to this action, the ADA of 1990, 42 U.S.C. §§ 12101 et seq., was in full force and effect in the United States and applicable to state prisons.

83.     Pursuant to 42 U.S.C. Section12132, Section 202 of Title II, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

84.     Morse was a qualified individual with a disability within the meaning of the ADA because Morse had a mental impairment that substantially limits one or more of Morse's major life activities, working. Morse received a 100 percent disability benefit from the Veterans Administration because of his inability to work.

85.     NDOC failed in its responsibilities under Title II to provide its services, programs and activities in a full and equal manner to Morse, a mentally disabled individual, including failure to provide the benefit of mental health services available at NNCC.

86.     NDOC failed to train, supervise, and/or discipline Defendants MURAKAMI and LEE in recognizing symptoms of a mental disability under Title II of the ADA; from excluding qualified individuals such as Morse from participation in NNCC's mental health services.

87.     Title II of the ADA requires government agencies to take disability into account by making reasonable modifications of their policies and practices where needed. 42 U.S.C. Section 12132, 28 C.F.R. Section 35.130(b)(7).

88.     NDOC is vicariously liable for the violations of Morse's rights under the ADA committed by Defendants MURAKAMI and LEE.

89.      As a direct and proximate result of NDOC's failure to comply with its duty under

Title II, Plaintiffs have suffered damages.

## THIRD CAUSE OF ACTION

### (Violation of Section 504 of the Rehabilitation Act of 1973)

### (Against NDOC)

90.    Plaintiffs reallege all preceding paragraphs and incorporates them by reference.

91.    Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 794 ("Section 504"), and the regulations promulgated thereunder prohibit discrimination against persons with disabilities. Section 504 prohibits the exclusion from participation in, or being denied the benefits of, or being subjected to discrimination under, any program or activity receiving federal financial assistance.

92.    Plaintiff is informed and believes and thereon alleges that NDOC is and has been at all relevant times the recipient of federal financial assistance, and that part of that financial assistance has been used to fund the NDOC medical programs and the activities.

93.    By its actions or inactions in denying Morse the ability to receive medical and mental health treatment and benefits, NDOC violated Plaintiff's rights under Section 504 of the Rehabilitation Act of 1973, and the regulations promulgated thereunder.

94.    NDOC is vicariously liable for the violations of Morse's rights under Section 504 committed by Defendants MURAKAMI and LEE.

95.    As a result of NDOC's failure to comply with their duty under Section 504 of the Rehabilitation Act of 1973 and the regulations promulgated thereunder, Plaintiffs have suffered damages, including special and general damages and lost income according to proof.

## FOURTH CAUSE OF ACTION

### (Survival Action: Violation of Fourteenth Amendment, 42 U.S.C. SECTION 1983)

### (Against Murakami and Lee)

96.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint.

97.     The foregoing claim for relief arose in Decedent Morse's favor and Decedent Morse would have been the Plaintiff with respect to this claim if he had lived.

98.     The individual Defendants, including DOES 1through 10, acted under color of law in failing to reasonably supervise Decedent Morse, were deliberately indifferent to Decedent Morse's medical/psychiatric care, thereby depriving Plaintiffs and Decedent Morse of certain constitutionally protect rights, including, but not limited to the right to due process of law.

99.     Said rights are substantive guarantees under the Fourteenth Amendment to the United States Constitution

## FIFTH CAUSE OF ACTION

### (Wrongful Death, NRS 42.085)

### (Against Murakami and Lee)

100.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint.

101.     Defendants MURAKAMI and LEE's deliberate indifference, wrongful acts and/or neglect were the direct and proximate cause of Morse's death.

102.     Defendants are liable to Morse's estate and heirs for damages as permitted by NRS 41.085, such damages including but not limited to grief and sorrow, loss of probable support, companionship, society, comfort and consortium, and damages for pain, suffering or disfigurement of the decedent, and for any special damages incurred by Morse, funeral expenses, and punitive damages as applicable.

///

///

///

23

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.      Issue a judgment declaring that the actions of Defendants described herein are unlawful and violate Plaintiffs' rights under the constitution and laws of the United States;

2.      For general damages in a sum according to proof;

3.      For special damages in a sum according to proof;

4.      For punitive damages in a sum according to proof;

5.      For leave to amend or supplement the Complaint as the identity of the DOE defendants are discovered and new evidence is uncovered;

6.      For declaratory relief;

7.      For reasonable attorney's fees, pursuant to 42 U.S.C. Section 1988;

8.      For cost of suit herein incurred; and,

9.      For such other and further relief as the Court deems just and proper.


DATED:  This 16th day of May 2017,


                    BY:


                            /s/ Terri Keyser-Cooper
                            TERRI KEYSER-COOPER
                            Law Office of Terri Keyser-Cooper


                            /s/ Luke A. Busby
                            LUKE A. BUSBY
                            Luke Andrew Busby, Ltd.

                            *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on Tuesday, May 16, 2017, I electronically transmitted the forgoing pleading to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel registered to receive Electronic Filings and/or I mailed the forgoing pleading to the address below by US Mail postage prepaid.

Clark G. Leslie
Office of the Attorney General
100 N Carson St
Carson City, NV 89701
775-684-1258
Fax: 775-684-1275
Email: cleslie@ag.nv.gov
*Attorney for the Defendants*

By:   /s/ Luke A. Busby

Luke Busby